RAFII & NAZARIAN, LLP
JOSEPH NAZARIAN, State Bar No. 272382
 *joe@rafiilaw.com*
9100 Wilshire Boulevard, Suite 465E
Beverly Hills, California 90212
Telephone:  310.777.7877
Facsimile:  310.777.7855

Attorneys for Defendant: ALANNA
MITCHELL aka ALLANNA KOLETTE.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

MICHAEL J. FOWLER, an individual,

Plaintiffs,

v.

ALANNA MITCHELL a/k/a ALANNA
KOLETTE a/k/a ALLANNA
KOLETTE, an Individual, KATARINA
VAN DERHAM a/k/a KATARINA
VANDERHAM f/k/a KATARINA
AMBRUSOVA, an Individual, KVD
BRAND, INC. d/b/a VIVA GLAM
MAGAZINE, a Corporation, YULIYA
BRADY a/k/a JULIA BRADY a/k/a
JULIA RUSS f/k/a YULIYA
MIKHAYLOVA, an Individual,
ANDREW TABLACK, an Individual,
ANGELICA CURIEL A/KA/
ANGELICA GOLDFINGER, an
Individual, and DOES 6 through 15,

Defendants.

Case No.

**NOTICE OF REMOVAL**

*Filed Concurrently with Declaration of Joseph Nazarian*

RAFII & NAZARIAN, LLP
9100 Wilshire Boulevard, Suite 465E
Beverly Hills, California 90212

## NOTICE OF REMOVAL

TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT Defendant ALANNA MITCHELL a/k/a ALANNA KOLETTE a/k/a ALLANNA KOLETTE ("Defendant") hereby removes Case No. BC670883 from the Los Angeles Superior Court to the United Stated District Court – Central District of California pursuant to 28 U.S.C. §§ 1332, 1441(a) and 1446, and as grounds for its removal states as follows:

## I.   STATEMENT OF THE CASE

1.   On August 1, 2017 Plaintiff MICHAEL J. FOWLER ("Plaintiff") filed a Complaint with the Los Angeles Superior Court – Central District entitled *Michael J. Fowler v. Alanna Mitchell, et al.* Case No. BC670883 (the "State Court Action"). A copy of the Complaint is attached as **Exhibit 1** hereto.

2.   On May 22, 2018, the Court, in the State Court Action, signed an order granting Plaintiff's motion to file a First Amended Complaint ("FAC"). The Court's order stated, *inter alia*, "Plaintiff/Cross-Defendant's First Amended Complaint is to be filed today and deemed served as of the date of this order upon Defendant/Cross-Complainant Alanna Mitchell a/k/a Allanna Kolette, who bas thirty days to respond." A copy of Plaintiff's FAC is attached as **Exhibit 2** hereto. A copy of the Court's order is attached as **Exhibit 3** hereto.

RAFII & NAZARIAN, LLP
9100 Wilshire Boulevard, Suite 465E
Beverly Hills, California 90212

3. The FAC added five additional defendants[1] and purports to assert 10 causes of action including (1) VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c); (2) VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d); (3) CIVIL CONSPIRACY; (4) CONVERSION; (5) UNJUST ENRICHMENT; (6) VIOLATION OF COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030, ET SEQ.; (7) VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2511, ET SEQ.; (8) VIOLATION OF STORED COMMUNICATIONS ACT, 18 U.S.C. § 2701, ET SEQ.; (9) BREACH OF CONTRACT; and (10) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

4. The FAC alleges that the defendants were engaged in a wide-ranging conspiracy to use "VIVA GLAM MAGAZINE" as a front for a prostitution ring, and in doing so, ensnared Plaintiff in a plot to blackmail wealthy men into spending money on their romantic partners. In addition, the newly added contract claims pertain to Defendant's alleged breach of a prior settlement agreement with Plaintiff from a prior lawsuit.

---

[1] The five new defendants are Katarina Van Derham, KVD Brand, Inc., Yuliya Brady, Andrew Tablack, and Angelica Curiel. To date, it is Defendant's understanding that none of the foregoing additional defendants have been served with the complaint. Based on the State Court's order, Plaintiff has until July 22, 2018 to serve the new defendants.

NOTICE OF REMOVAL

5. The relief Plaintiff seeks includes economic damages, treble damages, exemplary damage, attorneys' fees and costs, injunctive relief, and any other relief to which Plaintiff is entitled.

## II. REMOVAL IS PROPER BASED ON FEDERAL QUESTION JURISDICTION

6. Pursuant to 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." Federal courts have "original jurisdiction" over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

7. In his FAC, Plaintiff brings claims under four federal statutes: RICO, CFAA, ECPA, and the SCA. These claims all "arise under" the laws of the United States, and as such, are removable.[2] *See also* 18 U.S.C. § 1964 (expressly conferring federal jurisdiction over RICO claims). Plaintiff's also references another federal statute – the National Stolen Property Act ("NSPA") – in his claims for RICO violations, civil conspiracy, and breach of implied covenant of good faith and fair dealing (FAC ¶¶ 146, 158, 210).

---

[2] In his FAC, Plaintiff references the National Stolen Property Act ("NSPA") in his claims for RICO violations, civil conspiracy, and breach of implied covenant of good faith and fair dealing (FAC ¶¶ 146, 158, 210), but does not allege a stand-alone NSPA cause of action.

RAFII & NAZARIAN, LLP
9100 Wilshire Boulevard, Suite 465E
Beverly Hills, California 90212

A.   **THIS COURT HAS SUPPLEMENTAL JURISDICTION OVER THE STATE LAW CLAIMS**

8.   Under 28 U.S.C. 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." This grant of authority has been interpreted to mean that a district court may adjudicate both federal and state law claims that "derive from a common nucleus of operative fact and comprise but one constitutional case." *Mendoza v. Zirkle Fruit Co*., 301 F.3d 1163, 1174 (9th Cir. 2002) (recognizing authority of court in RICO case to exercise supplemental jurisdiction over state conspiracy claims) (internal citations omitted).

9.   Here, Plaintiff's federal claims are virtually inextricable from his state claims. Plaintiff's conspiracy claim is fashioned as "civil conspiracy to commit violations of RICO and other torts." (FAC, p. 24). The unjust enrichment and conversion claims are based, at least in part, on claims similar to those underlying the alleged CFAA, ECPA, and SCA violations. *Id*. at ¶¶ 164, 170. The claim for breach of implied covenant of good faith and fair dealing alleges that Defendant Mitchell breached this duty by entering into the settlement agreement with Plaintiff "in furtherance of the conspiracy to commit the wrongful acts alleged herein, including multiple related acts of wire fraud, extortion, economic espionage, theft of

RAFII & NAZARIAN, LLP
9100 Wilshire Boulevard, Suite 465E
Beverly Hills, California 90212

trade secrets, and violations of the National Stolen Property Act." *Id*. at ¶ 210. Even the breach of contract claim is based, in part, on Defendant Mitchell's violation of the confidentiality provision of the agreement by disclosing the agreement's contents to the defendants implicated in the federal claims. *Id*. at ¶ 205.

10. As such, Plaintiff's federal and state law claims both "derive from a common nucleus of operative fact and comprise but one constitutional case." This Court may therefore properly exercise supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).

## III.   REMOVAL IS TO THE PROPER COURT

11. Plaintiff filed his Complaint/FAC in the Central District of the Superior Court of the State of California for the County of Los Angeles, which is within this judicial district and division. *See* 28 U.S.C. § 84(c)(2). This Court is therefore the proper court for removal under 28 U.S.C. §§ 1441(a), 1446(a).

## IV.   REMOVAL IS TIMELY

12. The FAC was deemed filed and served on Defendant Mitchell on May 22, 2018, per the State Court's order (Exhibit 3). This Notice of Removal was filed prior to the expiration of the thirty-day period for removal prescribed by 28 U.S.C. § 1446(b).

## V.   DEFENDANT MITCHELL HAS SATISFIED ALL OF THE PROCEDURAL REQUIREMENTS FOR REMOVAL

13. Defendant Mitchell has not previously tried to remove this action.

RAFII & NAZARIAN, LLP
9100 Wilshire Boulevard, Suite 465E
Beverly Hills, California 90212

14. A copy of all documents in Defendant Mitchell's possession pertaining to the State Court Action, including, pursuant to 28 U.S.C. § 1446(a), all process, pleadings, and/or orders served on Defendant Mitchell in the State Court Action, are attached to concurrently filed Declaration of Joseph Nazarian as Exhibits 1 (Summons, Complaint, and case-initiating documents) and Exhibit 2 (docket in the State Court Action).

## VI.   <u>NOTICE TO ADVERSE PARTIES AND SUPERIOR COURT</u>

15. Promptly after the filing of this Notice of Removal, Defendant Mitchell will provide written notice of removal to all parties and the Superior Court, and will file a copy of this Notice of Removal with the Clerk of the Los Angeles Superior Court.

## VII. <u>CONCLUSION</u>

16. Based on the foregoing, Defendant Mitchell removes this action and request that further proceedings be conducted in this Court as required by law.

\\

\\

\\

\\

\\

\\

\\

NOTICE OF REMOVAL

17.As required by 28 U.S.C. 1446(a). The undersigned counsel for Defendant Mitchell has read the foregoing and signs this Notice of Removal pursuant to Rule 11 of the Federal Rules of Civil Procedure.

Dated:  June 15, 2018            Respectfully submitted,

RAFII & NAZARIAN, LLP


By:_____/s/ Joseph Nazarian_____
          Joseph Nazarian
          Attorneys for Defendant ALANNA
          MITCHELL

RAFII & NAZARIAN, LLP
9100 Wilshire Boulevard, Suite 465E
Beverly Hills, California 90212

# Exhibit "1"

# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

| | |
|---|---|
| **NOTICE TO DEFENDANT:**<br>*(AVISO AL DEMANDADO):*<br><br>ALANNA MITCHELL aka ALANNA KOLETTE,<br>an individual, and DOES 1 through 15, inclusive<br><br>**YOU ARE BEING SUED BY PLAINTIFF:**<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*<br><br>MICHAEL J. FOWLER, an individual | *FOR COURT USE ONLY*<br>*(SOLO PARA USO DE LA CORTE)*<br><br>CONFORMED COPY<br>ORIGINAL FILED<br>Superior Court of California<br>County of Los Angeles<br><br>AUG 03 2017<br><br>Sherri R. Carter, Executive Officer/Clerk<br>By Jenny D. Truong, Deputy |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Los Angeles Superior Central Dist.<br><br>111 North Hill Street<br>Los Angeles, CA 90012 | CASE NUMBER:<br>*(Número del Caso):*<br><br>BC670883 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Bovino Carminati, LLC, 600 East Hopkins Ave., Ste. 301 Aspen, CO 81611 (970)925-4445

| | | | |
|---|---|---|---|
| DATE: AUG 03 2017<br>*(Fecha)* | SHERRI R. CARTER | Clerk, by Jenny Truong | , Deputy |
| | | *(Secretario)* | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☒ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)

   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| | |
|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |

To: 19709253333 Case 2:18-cv-05523-RGK-MAA Document 1 Filed 06/21/18 Page 11 of 68 Page ID #:11

To: Civil Fax Filing Superior Court of Califor   Page 2 of 28  2017-08-01 21:49:05 (GMT)   12819290802 From: Maria-Vittoria Carminati

6013 90048

**FILED**
Superior Court of California
County of Los Angeles

AUG 0 1 2017

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
Ricardo Perez

1  David A. Bovino (SBN 257462)
2  **Bovino Carminati LLC**
3  600 East Hopkins Ave., Ste. 301
   Aspen, CO 81611
   (970) 925-4445
4  david@bovinolaw.com

   *Dept. 24*
   *Hon. Robert L. Hess*

5  Attorneys for Plaintiff
6  MICHAEL J. FOWLER

7

8  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9  **IN AND FOR THE COUNTY OF LOS ANGELES**

10

| | |
|---|---|
| 11  MICHAEL J. FOWLER, an individual, | Case No.  **B C 6 7 0 8 8 3** |
| 12  Plaintiffs | **COMPLAINT FOR UNJUST ENRICHMENT AND CONVERSION, VIOLATION OF THE CFAA, VIOLATION OF ECPA:** |
| 13  v. | |
| 14  | 1. **UNJUST ENRICHMENT** |
| 15  ALANNA MITCHELL aka ALANNA KOLETTE, an individual, and DOES 1 through 15, inclusive, | 2. **CONVERSION** |
| 16  | 3. **VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030, et seq.** |
| 17  Defendants. | 4. **VIOLATION OF ECPA, 18 U.S.C. § 2511.** |
| 18  | |
| 19  | **DEMAND FOR JURY TRIAL** |
| 20  | |

21

22  **PLAINTIFF'S ORIGINAL COMPLAINT**

23  Plaintiff MICHAEL J. FOWLER complains and alleges against Defendant ALANNA

24  MITCHELL, also known as ALANNA KOLETTE, and Does 1 through 15, inclusive (collectively,

25  "Defendants") the following:

26  **I.   PARTIES**

27  1.   Plaintiff Michael J. Fowler ("Plaintiff") is a resident of Puerto Rico.

28

2.      Defendant Alanna Mitchell ("Mitchell"), also known as Alanna Kolette is a resident of the County of Los Angeles, State of California.

3.      The true names and capacities, whether individual, corporate, or otherwise, of defendants Does 1 through 15 are presently unknown to Plaintiff, who therefore sues said Doe defendants by such fictitious names.  Plaintiff will amend his pleadings to show their true names and capacities when they have been ascertained.

## II.    JURISDICTION AND VENUE

4.      Jurisdiction and venue are proper in the Superior Court of Los Angeles County because it is where Mitchell resides.

## III.    FACTUAL BACKGROUND

5.      Plaintiff met Mitchell when he was 29 years old in March of 2015 at a large group dinner. They began a relationship immediately after. In 2016, Mitchell and Plaintiff broke up. A first lawsuit ensued. The parties entered into a Settlement Agreement and Plaintiff dismissed the lawsuit. Soon thereafter, Mitchell rekindled the relationship. Mitchell did so to gain access to Plaintiff's proprietary and confidential information, including trade secrets pertaining to Plaintiff's activities as a hedge fund manager and the proprietary software he employs to engage in those activities (the "Protected Information"). Protected Information includes:

   a. Communications between Plaintiff and members of management for companies where Plaintiff is a private investor;

   b. Financial records for companies in which Plaintiff is a private investor;

   c. Communications with and by Board Members of companies where Fowler serves on the Board of Directors or equivalent;

d.  Communications with individuals and entities with which Plaintiff has signed Non Disclosure Agreements;

e.  Communications discussing financial transfers with and among Plaintiff's business partners in their multi-family office;

f.  Communications discussing financial account balances and account numbers with and among Plaintiff's business partners in their multi-family office;

g.  Communications discussing portfolio positioning and strategy with and among Plaintiff's business partners in their multi-family office;

h.  Communications discussing specific mathematical algorithms with and among Plaintiff's business partners in their multi-family office;

i.  Plaintiff's communications with his private medical physician and other licensed medical providers;

j.  Plaintiff's communications with his legal counsel;

k.  Plaintiff's communications with his tax advisors and counsel; and

l.  Plaintiff's notes on Plaintiff's multi-family office's trade secrets.

6.  Plaintiff maintained such Protected Information on his cell phone and on other electronic devices, including his personal laptop (the "Devices").

7.  The Devices are continuously on the internet.

8.  The Devices are password protected.

9.  At no time did Mitchell have authority to access the Devices. Also, at no time was Mitchell authorized to access, view, copy or disseminate the Protected Information.

10.  Mitchell accessed the Protected Devices.

11.  Mitchell accessed, viewed, copied and/or disseminated the Protected Information.

2

12.     Mitchell gave unauthorized third parties access to the Protected Information.

13.     Specifically, for example, fewer than six months ago, Mitchell was in Plaintiff's home in Puerto Rico. Mitchell was sitting on Plaintiff's couch when she reached to grab Fowler's cell phone.

14.     Mitchell unlocked Plaintiff's phone, without Plaintiff's authorization. She reached for her own phone and took numerous photos of the contents of Plaintiff's phone. Plaintiff has video footage of Mitchell engaging in this behavior.

15.     Mitchell has numerous relationships with Plaintiff's competitors, including intimate and/or romantic relationships. Given these relationships, Mitchell would know how to profit from obtaining the Protected Information and selling it and/or distributing it to Plaintiff's competitors.

16.     Mitchell engaged in the activities above with malice and by use of fraud. Mitchell engaged in the conduct above with the intent to cause defendant injury and engaged in despicable conduct which was carried on by the Mitchell with a willful and conscious disregard of the rights or safety of others. Mitchell made intentional misrepresentations, was deceitful, or concealed material facts known to Mitchell with the intention on Mitchell's part to thereby deprive Plaintiff of property or legal rights or otherwise causing injury.

17.     Prior to commencing this action Counsel for Plaintiff transmitted two letters to Defendant Mitchell.  The first letter was a Demand for Inspection of her Electronic Devices and the second letter was a Preservation of Evidence Letter.  See Exhibits A and B attached hereto.  Mitchell failed to respond to both letters.

PLAINTIFF'S ORIGINAL COMPLAINT

## CAUSES OF ACTION

### A. Count One – Unjust Enrichment

18.   Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

19.   Mitchell was unjustly enriched as a result of her actions:

    a.   Mitchell received benefits from Plaintiff's Proprietary Information; and

    b.   Mitchell unjustly retained such benefits at the expense of Plaintiff.

### B. Count Two – Conversion

20.   Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

21.   Mitchell is liable for conversion.

22.   Plaintiff had ownership and/or rights to possession to personal property described above, including the Proprietary Information;

23.   Mitchell converted property by wrongful acts or disposition of Plaintiff's property rights; and

24.   As a result of Mitchell's actions, Plaintiff suffered damages.

### C. Count Three – Violation of the Computer Fraud and Abuse Act ("CFAA")

25.   Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

26.   The Computer Fraud and Abuse Act, 18 U.S.C. § 1030 et seq., prohibits unauthorized access to "protected computer[s]" under certain circumstances. 23. The term "protected computer" includes a computer "which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate

4

or foreign commerce or communication of the United States." 18 U.S.C. § 1030(e)(2)(B). A protected computer includes any website that is accessible on the internet. The Devices were protected computers under 18 U.S.C. § 1030(e)(2)(B).

27.     Plaintiff gained unauthorized access to the Devices. Plaintiff did so to obtain and use valuable information from the Devices, including the Protected Information. This information included, among other things:

a.   Communications between Plaintiff and members of management for companies where Plaintiff is a private investor;

b.   Financial records for companies in which Plaintiff is a private investor;

c.   Communications with and by Board Members of companies where Fowler serves on the Board of Directors or equivalent;

d.   Communications with individuals and entities with which Plaintiff has signed Non Disclosure Agreements;

e.   Communications discussing financial transfers with and among Plaintiff's business partners in their multi-family office;

f.   Communications discussing financial account balances and account numbers with and among Plaintiff's business partners in their multi-family office;

g.   Communications discussing portfolio positioning and strategy with and among Plaintiff's business partners in their multi-family office;

h.   Communications discussing specific mathematical algorithms with and among Plaintiff's business partners in their multi-family office;

i.   Plaintiff's communications with his private medical physician and other licensed medical providers;

5

j.   Plaintiff's communications with his legal counsel;

k.   Plaintiff's communications with his tax advisors and counsel; and

l.   Plaintiff's notes on Plaintiff's multi-family office's trade secrets.

All of the above is included in the definition of "Protected Information."

28.   Mitchell made accessed, viewed and made copies of the Protected Information. On information and belief, Mitchell distributed, disseminated, and/or sold the Protected Information to third parties.

29.   Mitchell knowingly, willfully, and with an intent to defraud Plaintiff accessed the Devices without authorization or in excess of authorization and obtained valuable information from the Devices that on information and belief, Mitchell used to obtain something of value.

30.   Plaintiff has been damaged in excess of $5,000.

31.   Plaintiff has been damaged by Defendant's actions, including being forced to expend resources to investigate the unauthorized access and abuse of its computer network. Plaintiff seeks compensatory and other equitable relief under 18 U.S.C. 8 1030(g) in an amount to be proven at trial.

32.   Plaintiff has suffered irreparable and incalculable harm and injuries resulting from Mitchell's conduct, which harm will continue unless Mitchell is enjoined from further unauthorized use of the Devices. Plaintiff has no adequate remedy at law.

**D. Count Four – Violation of the ECPA**

33.   Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

6

34.     The ECPA prohibits unauthorized access to electronic communications intended as confidential. The stored communication provisions of the ECPA specifically prohibit unauthorized access to or use of stored electronic communications.

35.     Mitchell violated 18 U.S.C. § 2511(1)(a) by intentionally, collecting, gathering intercepting, endeavoring to intercepting, transmitting, procuring, storing any other person to intercept or endeavor to intercept Plaintiff's electronic communications.

36.     Mitchell violated 18 U.S.C. § 2511(1)(c) by intentionally collecting, transmitting, storing and disclosing, or endeavoring to disclose, to any other person, the contents of Plaintiff's electronic communications, knowing or having reason to know that the information was obtained through the interception of Plaintiff's electronic communications.

37.     Mitchell violated 18 U.S.C. § 2511(1)(d) by intentionally using or endeavoring to use, the contents of Plaintiff's electronic communications, knowing or having reason to know that the information was obtained through the interception of private electronic communications.

38.     Plaintiff did not authorize or consent to Mitchell's interception of electronic communications.

39.     Section 2520 of the ECPA provides for a private cause of action and allows for declaratory and equitable relief as appropriate and statutory damages of the greater of $10,000 or $100 a day for each day of violation, actual and punitive damages, and reasonable attorney's fees and costs.

## IV.     PRAYER

40.     As a result of the above, Plaintiff prays that the Court award the following relief:

a.   Economic damages including actual damages and restitution;

b.   Exemplary damages and interest;

7

c.  Attorney's fees and costs;

d.  Injunctive relief preventing Mitchell from further distributing the Proprietary Information; an

e.  Any other relief to which Plaintiff is entitled.

Dated: August 1, 2017                    Respectfully submitted,

                                         **Bovino & Associates**
                                         David A. Bovino

                                 By  _David A. Bovino_____
                                         David A. Bovino

                                         Attorney for Plaintiff
                                         Michael J. Fowler

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 1, 2017                    Respectfully submitted,

                                         **Bovino Carminati LLC**
                                         David A. Bovino

                                 By  _David A. Bovino_____
                                         David A. Bovino

                                         Attorney for Plaintiff
                                         Michael J. Fowler

8

# EXHIBIT A



**ASPEN OFFICE**
Alpine Bank Building
600 E. Hopkins Ave., Ste. 301
Aspen, CO 81611
Telephone: 970.925.4445
Facsimile: 970.925.5333

**BOVINO CARMINATI**
**L.L.C.**

MARIA-VITTORIA G.
CARMINATI, Esq.
giugi@bovinolaw.com
Admitted in Texas, New
York, DC and Colorado

July 19, 2017

<u>E-Mail</u>
Alanna Mitchell
contactalannak@gmail.com
Ph: 321.749.4646

Re:    Breach of Duty of Good Faith and Fair Dealing; Violation of CFAA and ECPA.

Dear Ms. Mitchell,

As you know, this Firm represents Michael Fowler. In September 2016 you and Mr. Fowler signed a Settlement Agreement as a result of which you and Mr. Fowler agreed to have two dinners together and let bygones be bygones. After those dinners, you and Mr. Fowler rekindled your romantic relationship. However, based on your most recent behavior, it is suspected (given the face you made copies of such information with your own device) that you engaged in such a relationship to obtain sensitive and proprietary information, which you were aware you were not authorized to access, for your benefit or the benefit of unknown parties. We were retained to represent Mr. Fowler against you as a result of your infringing actions.

A few months ago, you were in Mr. Fowler's home in Puerto Rico. Specifically, you were sitting on the couch and you reached over for Mr. Fowler's phone. After unlocking Mr. Fowler's phone without Mr. Fowler's authorization, you reached over for your own phone and took numerous photos of the contents of Mr. Fowler's device. The reason Mr. Fowler knows all this is because Mr. Fowler has video footage of you doing so. His view of your activities is unobstructed. Your actions violate several federal statutes that give Mr. Fowlers claims with varying remedies against you. Although at this time we only have video of one isolated instance, it was evident that you were comfortable and used to engaging in this type of activity. Given your relationships, romantic and other, within Mr. Fowler's industry it is apparent you were engaging in espionage.

The Computer Fraud and Abuse Act ("CFAA") gives Mr. Fowler the right to pursue civil remedies for certain fraudulent activities related to computers and electronic records. The CFAA focuses on security (the protection of computers and computer networks), rather than on the privacy of digital information. Generally, the CFAA prohibits the unauthorized access to or damage of a "protected computer." The term "protected computer" is defined broadly as a computer used in interstate or foreign commerce or communication." The statute protects any computer connected to an interstate network, such as the World Wide Web, including Mr. Fowler's phone. For purposes of the statute, a person "exceeds authorized access" by "access[ing] a computer without authorization and us[ing] such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or alter." You were not entitled to obtain the information on Mr. Fowler's phone and yet you did so.

**BOVINO CARMINATI LLC**

Alana Mitchell
Page 2

The CFAA specifically prohibits obtaining anything of value by accessing a protected computer without authorization or, in accessing such a computer without authorization, causing damage, which includes any impairment to the integrity or availability of data, a program, a system, or information that:

a) causes loss aggregating at least $5,000 in value during any 1-year period to one or more individuals;
b) modifies or impairs, or potentially modifies or impairs, the medical examination, diagnosis, treatment, or care of one or more individuals;
c) causes physical injury to any person; or
d) threatens public health or safety.

The CFAA also authorizes civil causes of action to obtain compensatory damages and injunctive relief.

The second federal statute applicable in this case is the Electronic Communications Privacy Act ("ECPA"). The ECPA prohibits unauthorized access to electronic communications intended as confidential. The stored communication provisions of the ECPA specifically prohibit unauthorized access to or use of stored electronic communications. An aggrieved party such as Mr. Fowler may bring a civil cause of action for any "knowing or intentional" violation of the ECPA and may recover monetary damages, including actual damages, attorneys' fees and "any profits made by the violator as a result of the violation." The information on Mr. Fowler's phone was certainly confidential and highly proprietary.

Based on the above, Mr. Fowler is demanding the immediate delivery of all phones, tablets, and computers in your possession, custody, or control to Todd Stefan, Setec Investigations, 8391 Beverly Blvd. #167, Los Angeles, CA 90048. Mr. Fowler's designated computer forensic investigators will look for evidence of your obtaining and disseminating information you inappropriately obtained from Mr. Fowler's phone and, if applicable, any other devices you accessed. We expect you to contact me immediately to let me know the timing of your electronic device delivery to Setec Investigations.

This letter does not limit Mr. Fowler's ability to pursue any and all legal avenues against you, including claims not listed herein. Should this dispute proceed to litigation, Mr. Fowler will use all available remedies against you. This case can and should be settled outside a courtroom. However, if this negotiation is unsuccessful, the parties will proceed to litigation at great human and capital expense. While Mr. Fowler believes strongly in the legal and equitable merits of his position, he recognizes and understands that any settlement will necessarily involve a reasonable compromise. Mr. Fowler hopes we are able to reach an agreement and that you can dispel his well-founded belief that you improperly accessed private information. That will allow you and him to return your energies to more productive endeavors.

Further, as soon as you retain counsel, please let me know that is the case so that I may communicate with them directly.

BOVINO CARMINATI LLC

Alana Mitchell
Page 3

Regards,

Maria-Vittoria "Giugi" Carminati, Esq.

Cc:

# EXHIBIT B

**ASPEN OFFICE**
Alpine Bank Building
600 E. Hopkins Ave., Ste. 301
Aspen, CO 81611
Telephone: 970.925.4445
Facsimile: 970.925.5333

# BOVINO CARMINATI
## L.L.C.

MARIA-VITTORIA G.
CARMINATI, Esq.
giugi@bovinolaw.com
Admitted in Texas, New
York, DC and Colorado

July 19, 2017

**E-Mail**
Alanna Mitchell
contactalannak@gmail.com
Ph: 321.749.4646

      Re:    Notice of Preservation.

Dear Ms. Mitchell,

This letter will serve as notice to Alanna Mitchell ("Mitchell") of her obligation to preserve any and all documents, tangible things, electronically stored information that relates or potentially relates, directly or indirectly, to any claims brought by Michael Fowler ("Fowler") against Mitchell including, but not limited to, all documents, electronic communications or evidence that relate to claims or allegations raised in the Complaints filed by Fowler.

As used in this document, "you" and "your" refers to Mitchell, and includes her agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions. This will also serve as notice that Mitchell should not instruct her friends or family members to remove or otherwise destroy relevant evidence.

You should anticipate that much of the information subject to disclosure or responsive to discovery in any action is stored on your current and former computer systems and other media and devices (including personal digital assistants, voice-messaging systems, voice messaging systems, online repositories and cell phones).

Electronically stored information (hereinafter "ESI") should be afforded the broadest possible definition and includes (by way of example and not as an exclusive list) potentially relevant information electronically, magnetically or optically stored as: digital communications (e.g., e-mail, voice mail, instant messaging, text messaging); word processed documents (e.g., Word or WordPerfect documents and drafts); spreadsheets and tables (e.g. Excel or Lotus 123 worksheets); Accounting Application Data (e.g., Quickbooks, Money, Peachtree date files); Image and Facsimile Files (e.g., .PDF, .TIFF, .JPG, .GIF images); Sound Recordings (e.g., WAV and .MP3 files); Video and Animation (e.g., VAI and .MOV files); Databases (e.g., Access, Oracle, SQL Server data, SAP); Contact and Relationship Management Date (e.g., Outlook, AT!); Calendar and Diary Application Data (e.g., Outlook, PST, Yahoo, blog tools); Online Access Data (e.g., Temporary Internet Files, History, Cookies); Presentations (e.g., PowerPoint, Corel Presentations); Network Access and Server Activity Logs; Project Management Application Data; Back Up and Archival Files (e.g., Zip, .GHO).

BOVINO CARMINATI LLC

Alana Mitchell
Page 2

ESI resides not only in areas of electronic, magnetic and optical storage media reasonably accessible to you, but also in areas you may deems not reasonably accessible. You are obliged to preserve potentially relevant evidence from both these sources of ESI, even if you do not anticipate producing such ESI.

You must act immediately to preserve potentially relevant ESI and other information. Adequate preservation of ESI and other evidence requires more than simply refraining from efforts to destroy or dispose of such evidence. You must also intervene to prevent loss due to routine operations and employ proper techniques and protocols suited to protection of ESI. Be advised that sources of ESI are altered and erased by continued use of your computers and other devices. Booting a drive, examining its contents or running any application will irretrievably alter the evidence it contains and may constitute unlawful spoliation of evidence. Consequently, alternation and erasure may result from your failure to act diligently and responsibly to prevent loss or corruption of ESI.

Nothing in this demand for preservation of ESI should be understood to diminish your concurrent obligation to preserve documents, tangible things and other potentially relevant evidence.

You are directed to immediately initiate a litigation hold for potentially relevant ESI, documents and tangible things, and to act diligently and in good faith to secure and audit compliance with such litigation hold. You are further directed to immediately identify and modify or suspend features of your information systems and devices that, in routine operation, operate to cause the loss of potentially relevant ESI.

The lawsuit requires preservation of all information from Mitchell's computer systems, removable electronic media, and other locations. This includes, but is not limited to, email and other electronic communication, word processing documents, spreadsheets, databases, calendars, telephone logs, contact manager information, Internet usage files, and network access information. Mitchell should also preserve the following platforms in the possession of Mitchell or a third party under the control of Mitchell (such as an employee or outside vendor under contract): databases, networks, computer systems, including legacy systems (hardware and software), servers, archives, backup or disaster recovery systems, tapes, discs, drives, cartridges and other storage media, laptops, personal computers, internet data, personal digital assistants, handheld wireless devices, mobile telephones, paging devices, and audio systems (including voicemail).

All of the information contained in the letter should be preserved for the following dates and time periods: January 1, 2016, to the Present.

## PRESERVATION OBLIGATIONS

As noted above, the laws and rules prohibiting destruction of evidence apply to electronically stored information in the same manner that they apply to other evidence. Due to its format, electronic information is easily deleted, modified or corrupted. Accordingly, Mitchell must take every reasonable step to preserve this information until the final resolution of this matter. This includes, but is not limited to, an obligation to: (1) Discontinue all data destruction and backup

Alana Mitchell
Page 3

tape recycling policies;(2) Preserve and not dispose of relevant hardware unless an exact replica of the file (a mirror image) is made; (3) Preserve and not destroy passwords, decryption procedures (and accompany software), network access codes, ID names, manuals, tutorials, written instructions, decompression or reconstruction software; and, (4) Maintain all other pertinent information and tools needed to access, review, and reconstruct necessary to access, view, and/or reconstruct all requested or potentially relevant electronic data.

## DESCRIPTION OF DATA SOUGHT

The claims of Fowler or any lawsuit requires preservation of all information from Mitchell's computer systems, removable electronic media and other locations relating to the matters set forth in the Complaint filed by Fowler or any counterclaim or claim asserted by Mitchell, whether filed at the time of this letter or thereafter. This includes, but is not limited to, email and other electronic communication, word processing documents, spreadsheets, databases, calendars, telephone logs, contact manager information, Internet usage files, and network access information.

**I. Electronic Files.** You have an obligation to preserve all digital or analog electronic files in electronic format, regardless of whether hard copies of the information exist. This includes preserving:

A. Active data (i.e., data immediately and easily accessible on the client's systems today);

B. Archived data (i.e., data residing on backup tapes or other storage media);

C. Deleted data (i.e., data that has been deleted from a computer hard drive but is recoverable through computer forensic techniques); and

D. Legacy data (i.e., data created on old or obsolete hardware or software).

E. Mitchell must preserve active, archived and legacy data including but not limited to:

1. Word-processed files, including drafts and revisions;
2. Spreadsheets, including drafts and revisions;
3. Databases;
4. CAD (computer-aided design) files, including drafts and revisions;
5. Presentation data or slide shows produced by presentation software (such as Microsoft PowerPoint);
1. Graphs, charts and other data produced by project management software (such as Microsoft Project);
2. Animations, images, audio, video and audiovisual recordings, MP3 players, and voicemail files;
3. Data generated by calendaring, task management and personal information management (PIM) software (such as Microsoft Outlook or Lotus Notes);

B O V I N O   C A R M I N A T I   L L C

Alana Mitchell
Page 4

4. Data created with the use of personal data assistants (PDAs), such as PalmPilot, HP Jornada; Cassiopeia or other Windows CE-based, iPhones, iPads or Pocket PC devices;

6. Data created with the use of document management software; and

7. Data created with the use of paper and electronic mail logging and routing software.

F. Mitchell must preserve media used by Mitchell computers including but not limited to:

1. Magnetic, optical or other storage media, including the hard drives or floppy disks used by Mitchell's computers;

2. 2. Backup media (i.e., other hard drives, backup tapes, floppies, Jaz cartridges, CDROMs) and the software necessary to reconstruct the data contained on the media; and

3. Archived media (you should retain a mirror image copy of any media no longer in service but used between March 2015 and the present.

**II. Hardware.** Mitchell has an obligation to preserve all electronic processing systems, even if they are replaced. This includes computer servers, stand-alone personal computers, hard drives, laptops, PDAs, and other electronic processing devices. Mitchell should retain copies of any hardware no longer in service but used between March 2015 and the present.

**III. Emails.** You have an obligation to preserve all potentially relevant internal and external emails that were sent or received. Email must be preserved in electronic format, regardless of whether hard copies of the information exist.

**IV. Internet Web Activity.** You have an obligation to preserve all records of Internet and Web-browser generated files in electronic format, regardless of whether hard copies of the information exist. This includes Internet and Web-browser-generated history files, caches and "cookies" files stored on backup media or generated by an individual employed at Mitchell.  Further, you have an obligation to preserve the data, imaging and materials that existed during the relevant period on any website, webpage or domain operated or maintained by Mitchell including all versions of the same.

**V. Activity Logs.** Mitchell must preserve all hard copy or electronic logs documenting computer used by Mitchell.

**VI. Supporting Information.** Mitchell must preserve all supporting information relating to the requested electronic data and/or media including:  Codebooks, keys, data dictionaries, diagrams, handbooks, or other supporting documents that aid in reading or interpreting database, media, email, hardware, software, or activity log information.

**VII. Other Relevant Information**

A. Documents relating to Mitchell's computer systems, programs, software, hardware, materials, tools or information that Mitchell uses or used to track, monitor or prevent discriminatory employment practices.

Alana Mitchell
Page 5

B. From March 2015 to the present all documents that relate to any software or hardware computer changes affecting your Human Resources database.

**DESCRIPTION OF DOCUMENTS AND MEDIA THAT SHOULD BE PRESERVED**

**I. Data Preservation.** Mitchell should immediately preserve all data and information about the data (i.e., backup activity logs and document retention policies) relating to documents maintained in the ordinary course of business for the employees listed below. This includes, but is not limited to, the information listed below.

A. Email and any relevant metadata, including message contents, header information, and email system logs that was sent or received by or is in the possession of the following parties and/or contains information about the following subjects:

    1. Parties (including all employees, officers or agents of the same):

        a) Alanna Mitchell
        b) Michael Fowler

    2. Subject Matters include, but are not limited to:

        a) Any issue raised by the Parties in any litigation;
        b) Any communications to any third parties regarding Fowler or any of the allegations in the Complaint; and
        c) Any conduct alleged in the Complaint including other complaints or allegations of the same or similar conduct.

B. All active and deleted copies of any word processing files, spreadsheets, PowerPoint presentations, or other documents that are in the possession of the following parties and/or contain information about the Parties and/or Subject Matters identified above.

C. Databases and any information about the databases that are in the possession of the following parties and/or contain information about the Parties and/or Subject Matters identified above.

D. All paper and/or electronic logs of computer system and network activity that pertain to electronic data storage that are in the possession of the following parties and/or contain information about the Parties and/or Subject Matters identified above.

E. All active and deleted copies of any electronic calendars or scheduling programs, including programs maintained on PDAs, that are in the possession of the Parties and/or Subject Matters identified above.

BOVINO CARMINATI LLC

Alana Mitchell
Page 6

F.  All active, archived, legacy, and deleted copies of any other electronic data that are in the possession of the Parties and/or Subject Matters identified above.

## II. Data Storage Devices

A.  *Online Data Storage.* If Mitchell use(s) online storage and/or direct access storage devices, they must immediately cease modifying or deleting any electronic data unless a computer forensic expert makes a mirror image of the electronic file, follows proper preservation protocols for assuring the accuracy of the file (i.e., chain of custody), and makes the file available for litigation.

B.  *Offline Data Storage.* Offline data storage includes, but is not limited to, backup and archival media, floppy diskettes, magnetic, magneto-optical, and/or optical tapes and cartridges, DVDs, CD ROMs, and other removable media. Mitchell should immediately suspend all activity that might result in destruction or modification of all of the data stored on any offline media. This includes overwriting, recycling or erasing all or part of the media. This request includes, but is not limited to, media used to store data from personal computers, laptops, mainframe computers, and servers.

C.  *Data Storage Device Replacement.* If Mitchell replace(s) any electronic data storage devices, Mitchell may not dispose of the storage devices.

D.  *Preservation of Storage Devices.* Mitchell may not modify, delete or otherwise alter (i.e., by data compression, disk de-fragmentation, or optimization routines) any electronic data unless a computer forensic expert makes a mirror image of the electronic file, follows proper preservation protocols for assuring the accuracy of the file (i.e., chain of custody), and makes the file available for litigation. The expert must make a mirror image of active files, restored versions of deleted files, and restored versions of deleted file fragments, hidden files, and directory listings. This includes, but is not limited to, preserving electronic data (stored on online or offline storage devices) that came from the following hardware or software applications: (1) Fixed drives on stand-alone personal computers or laptops; (2) Network servers and workstations; and (3) Software application programs and utilities.

## PRESERVATION COMPLIANCE

**I. Activity Log.** To show preservation compliance, Mitchell must maintain a log, documenting all alterations or deletions made to any electronic data storage device or any electronic data processing system. The log should include changes and deletions made by supervisors, employees, contractors, vendors, or any other third parties.

**II. Mirror Images.** Mitchell must secure a mirror image copy (a bit-by-bit copy of a hard drive that ensures the computer system is not altered during the imaging process) of all electronic data contained on her personal computers and/or laptops. The mirror image should include active files, deleted files, deleted file fragments, hidden files, directories, and any other data contained on the

Alana Mitchell
Page 7

computer. Mitchell must also collect and store any offline or online storage devices that contain data from any electronic processing devices of hers.

**III. Chain of Custody.** For each piece of media that Mitchell preserve(s), Mitchell must document a complete chain of custody. A proper chain of custody will ensure that no material changes, alterations or modifications were made while the evidence was handled. Chain of custody documentation must indicate where the media has been, whose possession it has been in, and the reason for that possession.

**IV. Electronic Data Created After This Letter.** For any electronic data created after this letter or for any electronic processing systems used after this letter, Mitchell must take the proper steps to avoid destroying potentially relevant evidence. This includes following the above preservation protocols.  Compliance with Mitchell's preservation obligations includes forwarding a copy of this letter to all individuals or organizations that are responsible for any of the items referred to in this letter

If any part of the Notice of Preservation is unclear, please contact me immediately. Further, as soon as you retain counsel, please let me know that is the case so that I may communicate with them directly.

Regards,

Maria-Vittoria "Giugi" Carminati, Esq.

Cc:

BOVINO CARMINATI LLC

**Exhibit "2"**

David A. Bovino (SBN 257462)
David@BovinoLaw.com
Maria Gorecki (*pro hac vice*)
Maria@BovinoLaw.com
BOVINO & ASSOCIATES LLC
600 East Hopkins Avenue, Suite 301
Aspen, Colorado 81611
PH: (970) 925-4445
FX: (970) 925-5333
Attorneys for Plaintiff Michael J. Fowler

**IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

| | |
|---|---|
| MICHAEL J. FOWLER, an Individual,<br><br>  Plaintiff,<br><br>  v.<br><br>ALANNA MITCHELL a/k/a ALANNA KOLETTE a/k/a ALLANNA KOLETTE, an Individual, KATARINA VAN DERHAM a/k/a KATARINA VANDERHAM f/k/a KATARINA AMBRUSOVA, an Individual, KVD BRAND, INC. d/b/a VIVA GLAM MAGAZINE, a Corporation,  YULIYA BRADY a/k/a JULIA BRADY a/k/a JULIA RUSS f/k/a YULIYA MIKHAYLOVA, an Individual, ANDREW TABLACK, an Individual, ANGELICA CURIEL A/KA/ ANGELICA GOLDFINGER, an Individual, and DOES 6 through 15,<br><br>  Defendants. | Case No. BC670883<br><br>**PLAINTIFF MICHAEL J. FOWLER'S FIRST AMENDED COMPLAINT FOR:**<br>1.  **VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)**<br>2.  **VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)**<br>3.  **CIVIL CONSPIRACY**<br>4.  **CONVERSION**<br>5.  **UNJUST ENRICHMENT**<br>6.  **VIOLATION OF COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C.  § 1030, *ET SEQ.***<br>7.  **VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2511, *ET SEQ.***<br>8.  **VIOLATION OF STORED COMMUNICATIONS ACT, 18 U.S.C. § 2701, *ET SEQ.*** |
| ALANNA MITCHELL aka ALLANNA KOLETTE,<br><br>  Cross-Complainant,<br><br>v.<br><br>MICHAEL J. FOWLER, and ROES 1 through 15, inclusive,<br><br>  Cross-Defendant(s). | 9.  **BREACH OF CONTRACT**<br>10. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>Assigned for All Purposes to<br>Hon. Elizabeth A. White<br>Div. 48<br><br>Action Filed: August 1, 2017<br>Trial Date: Not Set |

1

FIRST AMENDED COMPLAINT

Plaintiff MICHAEL J. FOWLER ("Plaintiff" or "Fowler") complains and alleges against Defendants Alanna Mitchell a/k/a Alanna Kolette a/k/a Allanna Kolette ("Mitchell"), Katarina Van Derham a/k/a Katarina Vanderham f/k/a Katarina Ambrusova ("Van Derham"), KVD Brand, Inc. d/b/a Viva Glam Magazine ("*Viva Glam*"), Yuliya Brady a/k/a Julia Brady a/k/a Julia Russ f/k/a Yuliya Mikhaylova ("Brady"), Andrew Tablack ("Tablack"), Angelica Curiel a/k/a Angelica Goldfinger ("Curiel"), and Does 6 through 15 inclusively (collectively, "Defendants") the following:

## <u>INTRODUCTION</u>

1.     Katarina Van Derham created a lucrative RICO enterprise (the "Viva Glam Enterprise") based on the axioms that attractive women can lure wealthy men; attractive women who are willing to have sex with wealthy men will be richly compensated; and attractive women who are willing to extort wealthy men can ensure a continued and sizable income stream (all unreported income, of course).

2.     Although Van Derham claims that the women her online *Viva Glam* magazine discovers and recruits are "models," in reality, they are not compensated for their purported modeling work. Rather, they sit for *Viva Glam* photo shoots and receive in return a portfolio of provocative photos that the Viva Glam Enterprise uses to lure wealthy men to pay for the company of and sex with these women. Indeed, Defendant Mitchell testified during her deposition that the purpose of these photoshoots was to build her portfolio and that she was not compensated, other than receiving free flights to exotic locations.

3.     Mitchell has been best friends with Brady and Curiel for years.  Upon moving to Los Angeles, they associated with the Viva Glam Enterprise. Mitchell testified that Curiel introduced her to Van Derham, who she calls "Kat," during a photoshoot in Los Angeles in 2013.  Mitchell also testified that Van Derham recruited her to be a Viva Glam "model" and she arranged at least three Viva Glam photoshoots for Mitchell, including one in Hawaii.

4.     The women who are members of the Viva Glam Enterprise, including Mitchell, Brady, and Curiel, prowl for wealthy men they can entrap.

5.     Upon information and belief, Van Derham not only condoned Mitchell and Brady targeting wealthy men, she actively encouraged them because Van Derham wanted *Viva Glam* to develop

its reputation as the premier source for wealthy men to find and procure the company, and more, of beautiful women.

6.      In fact, *Viva Glam*'s reputation as a front for prostitution is widely known. After actress Greice Santo was propositioned for sex by billionaire Daryl Katz in connection with the *Viva Glam* photo shoot in Hawaii, Santo's husband filed a complaint in which he alleged that Katz used *Viva Glam* as his personal source of prostitutes.[1]  Santo filed a police report in which she averred that when she told Van Derham that Katz had propositioned her for sex in exchange for money, Van Derham was not fazed, responding, "It's no big deal, he's like that, he told me he was going to have sex with you no matter what."

7.      When they find their targets, the women who are members of the Viva Glam Enterprise convince the men to pay for their company and/or sex. Upon information and belief, sometimes the women ask for an immediate payment in exchange for services provided.  Other times the women take a more subtle approach – developing relationships with the men and using them for longer-term financial gain.

8.      The women who participate in the Viva Glam Enterprise search for their marks' vulnerabilities and take affirmative steps to guarantee they can exploit them later.

9.      Upon information and belief, the women comprising the Viva Glam Enterprise, including Van Derham, Mitchell, Brady, and Curiel targeted a reality television star, a Grammy Award-winning pop vocalist, wealthy Middle Eastern investors, and wealthy hedge-fund managers, including Michael Fowler.

10.      Fowler was the perfect target for the Viva Glam Enterprise. Fowler earned a fortune at a young age based on his development of a complex algorithm that has proven immensely successful at predicting directional change in the stock market. At the time he was targeted by the Viva Glam Enterprise, Fowler was single but receptive to having a girlfriend.

11.      Brady met Fowler through her work for a media company in Los Angeles with which Fowler was involved. Knowing her friend Mitchell's desire to further the Viva Glam Enterprise and find

---

[1] *Cipriani v. Bunting*, filed on April 2, 2017, Index Number 153047/2017, in the State of New York.

3

a wealthy man to use for her and the Viva Glam Enterprise's financial gain, Brady introduced Fowler to Mitchell.

12.     Upon information and belief, the individuals comprising the Viva Glam Enterprise, including Van Derham, Mitchell, Brady, and Curiel intended to share in the ill-gotten profits from Mitchell's introduction to, and subsequent relationship with, Fowler.

13.     Brady and Mitchell immediately began to take advantage of Fowler's generosity and to exploit his wealth, letting Fowler take them on an all-expenses-paid vacation to Europe and roping Fowler into immediately wiring Mitchell  $100,000 to alleviate Mitchell's "stress" of having bills to pay – stress she claimed otherwise would prevent her from taking the European vacation with Fowler and Brady.  Mitchell falsely represented to Fowler that she would use his money to pay her rent.  Upon information and belief, Mitchell was funneling a portion of the money into the Viva Glam Enterprise.

14.     Two months later, Mitchell convinced Fowler to set up a joint bank account for her to pay her expenses, in which Fowler deposited $60,000 in only a few months.  Fowler and Mitchell specifically agreed the money in the Account was to be used for Mitchell's expenses, and did not include rent. Fowler discovered Mitchell was not using the money as intended, and when confronted, Mitchell refused to tell him how she was spending the money.

15.     Mitchell's financial demands from and expectations of Fowler only increased over time. Eventually, she arranged to live with Fowler in Puerto Rico, where he paid for all of her living expenses, and, in addition, she extracted a sizeable allowance that he wired to her every month, as well as numerous luxury gifts that she moved across state lines.

16.     In deposition, Mitchell admitted Fowler gave her more than $100,000 in gifts and cash, including art, a tennis bracelet, earrings, clothes, watch, an Amazon Kindle, and a bicycle.

17.     In reality, Fowler gave Mitchell approximately $850,000 in cash, gifts, and other luxury items during their two-year relationship.

18.     As a result of Mitchell repeatedly lying to Fowler and, when confronted, physically assaulting him and damaging his property, Fowler broke up with Mitchell.

19. Fowler commenced his first lawsuit against Mitchell, in which he sought to recover for the damage she inflicted on him.

20. Upon information and belief, the first lawsuit between Fowler and Mitchell worried Van Derham. Upon information and belief, Van Derham expressed to Mitchell her concern that Fowler might know enough to expose and ruin the Viva Glam Enterprise, information that Mitchell conveyed to Brady. Indeed, in May 2017, when Fowler discovered the lawsuit naming *Viva Glam* as a front for prostitution, Mitchell told Fowler, "I told you about that because Katarina [Van Derham] was really worried when you were suing me before."

21. Upon information and belief, Van Derham encouraged Mitchell to find a way back into Fowler's good graces, to smooth things over and ensure that he did not try to ruin the Viva Glam Enterprise, and to find leverage the Viva Glam Enterprise could use later should Fowler threaten the Viva Glam Enterprise.

22. Mitchell did as she was told. She "came clean" to Fowler, including admitting to serving as an escort for other men, apologized, and pleaded for his sympathy and generosity.

23. Given Mitchell's apparent act of honesty and good faith, Fowler succumbed to Mitchell's entreaties, and they resumed a relationship.

24. Unbeknownst to Fowler, Mitchell immediately began searching for ways to compromise Fowler, which she believed would not only serve the Viva Glam Enterprise, but would serve her personally in the future as leverage to get Fowler to continue to pay her substantial sums of money.

25. Brady and her drug-dealer boyfriend, Andrew Tablack, also did what they could to help compromise Fowler.

26. Brady prodded Fowler for information about cryptocurrency that she thought could facilitate Tablack's drug dealing, while also tainting Fowler with the illegal activities, and she asked Fowler about "investing," which he understood to mean that she wanted to help Tablack launder drug money. Fowler refused to help.

27. Tablack himself pushed for an introduction to Fowler to try to get Fowler to launder money. Mitchell was more than happy to, and did, in fact, introduce Tablack to Fowler, as it furthered

her and the Viva Glam Enterprise's goals of compromising Fowler. But Fowler refused to help Tablack. During her deposition, Mitchell asserted her Fifth Amendment right against self-incrimination and refused to answer any questions relating to Tablack.

28.     Mitchell ultimately found a way to satisfy Van Derham's concerns and to secure Fowler's continued endowment. Without Fowler's permission – in fact, directly contrary to his repeated instruction that she not access his phone – Mitchell accessed Fowler's mobile phone and took screen shots of his personal information. On information and belief, the information Mitchell accessed and took included privileged and proprietary information. During her deposition, Mitchell admitted that she spent time accessing Fowler's phone and reviewing and taking screenshots of his text messages and emails on the false assumption that she was permitted to do so.  Specifically, Mitchell admitted during her deposition that she took screenshots of Fowler's phone on at least two occasions in October 2016 and January/February 2017.  During her deposition, she also admitted reading, and then deleting, a critical email to Fowler from a business associate regarding one of his businesses.

29.     Mitchell knew that Fowler's personal information was valuable – she could use it either to extort money from Fowler later in exchange for her agreement to not disclose the information, or she could sell proprietary information to his competitors – some of whom were clients to whom she provided escort services through the Viva Glam Enterprise – should he not accede to her future demands.

30.     This Act 2 of Mitchell's relationship with Fowler came to its close when Fowler caught Mitchell on videotape surreptitiously accessing and taking dozens of screen shots of information on his cell phone while he slept.

31.     After Fowler and Mitchell parted ways again, Fowler commenced this litigation to, among other things, find out precisely what information Mitchell took and with whom she shared it.

32.     This second litigation between Fowler and Mitchell worried Van Derham even more than the first, particularly because, to get Fowler to give her a second chance, Mitchell had "come clean" to Fowler, which included Mitchell admitting that she was an escort.

33.     Upon information and belief, Van Derham encouraged Mitchell to destroy evidence that Van Derham feared would implicate the Viva Glam Enterprise.

34.     Although a litigation hold notice was issued to Mitchell before this lawsuit commenced, curiously, all of Mitchell's documents relating to *Viva Glam* were "lost or inadvertently destroyed."

35.     And, shortly after document discovery began and mere weeks before her deposition in this matter, Mitchell conveniently "lost" her cell phone – which she admitted she used as her computer – and all of the data on it while she was with Curiel, another member of the Viva Glam Enterprise.

## THE PARTIES

36.     Plaintiff Michael J. Fowler ("Plaintiff") is a resident of Puerto Rico.

37.     Defendant Alanna Mitchell, also known as Alanna Kolette and Allanna Kolette, is a resident of the County of Los Angeles, State of California.

38.     Defendant Katarina Van Derham, also known as Katarina Vanderham, and formerly known as Katarina Ambrusova, is a resident of the County of Los Angeles, State of California. On filing the initial Complaint, and not knowing the true name of Defendant Van Derham, Plaintiff designated Van Derham by the fictitious name of Doe 1.

39.     Defendant KVD Brand, Inc., doing business as *Viva Glam* magazine, is a corporation formed under the laws of the State of California with its principal place of business in Los Angeles County. On filing the initial Complaint, and not knowing the true name of Defendant *Viva Glam*, Plaintiff designated *Viva Glam* by the fictitious name of Doe 2.

40.     Defendant Yuliya Brady, also known as Julia Brady and Julia Russ, and formerly known as Yuliya Mikhaylova, is a resident of the County of Los Angeles, State of California. On filing the initial Complaint, and not knowing the true name of Defendant Brady, Plaintiff designated Brady by the fictitious name of Doe 3.

41.     Defendant Andrew Tablack was a resident of the County of Los Angeles. Tablack was recently arrested for his involvement in a large-scale opioid distribution conspiracy in New Jersey. On information and belief, Defendant is currently incarcerated in federal prison. On filing the initial Complaint, and not knowing the true name of Defendant Tablack, Plaintiff designated Tablack by the fictitious name of Doe 4.

42.     Defendant Angelica Curiel, also known as Angelica Goldfinger, is a resident of the County of Los Angeles, State of California. On filing the initial Complaint, and not knowing the true name of Defendant Curiel, Plaintiff designated Curiel by the fictitious name of Doe 5.

43.     The true names and capacities, whether individual, corporate, associate, or otherwise, of those Defendants sued herein as Does 6 through 15, inclusive, are currently unknown to Plaintiff who therefore sues said Defendants by such fictitious names. Defendants designated herein as a Doe are legally responsible in some manner for the events and happenings referred to herein and caused injury and damage proximately thereby to Plaintiff as hereinafter alleged. Plaintiff will seek leave of Court to amend this Complaint to show the true names and capacities of the Defendants designated herein as Does when the same have been ascertained. Whenever in this Complaint reference is made to "Defendants" and/or to "each of them," such allegations shall be deemed to mean the acts of Defendants acting individually, jointly, and/or severally.

44.     Except as otherwise pleaded herein, Plaintiff is informed and believes, and based thereon alleges, that each of the Defendants was acting individually and/or as the agent, employee, servant or representative of each of the remaining Defendants, and in doing the things and acts alleged herein, was acting individually and within the course and scope of that agency, employment, service, and representation, and with the knowledge, ratification, approval, authorization, and consent of each of the other Defendants and/or their officers, partners, and/or managing agents.

45.     Plaintiff is informed and believes, and based thereon alleges, that the Defendants conspired with one another to commit the wrongful acts complained of herein and they, and each of them, engaged in and operated the conspiracy for such purpose. The wrongful acts alleged herein were done pursuant to and in furtherance of the objects of the conspiracy, which are the torts and criminal acts alleged in this Complaint and the resulting damage to Plaintiff. Plaintiff was damaged as a result of the conspiracy and the acts committed in furtherance thereof. As a result, Defendants are not only liable for their direct torts and tortious conduct but are secondarily liable to Plaintiff as a result of the conspiracy.

46.     Plaintiff is informed and believes, and based thereon alleges, that each of the Defendants aided and abetted one another by providing substantial encouragement and/or assistance in doing the acts

alleged herein, with knowledge of the wrongful nature of the conduct and the harm to Plaintiff that would result therefrom. There is and was a substantial causal connection between the conduct of the aider and abettor and the harm to Plaintiff, and the encouragement and/or assistance was a substantial factor in causing the resulting harm. As a result, Defendants are not only liable for their direct torts and tortious conduct but are secondarily liable to Plaintiff as a result of their aiding and abetting.

## JURISDICTION AND VENUE

47.     Jurisdiction and venue are proper in the Superior Court of Los Angeles County because it is the county where Mitchell, Van Derham, Curiel, and Brady reside, and the county where *Viva Glam*'s principal place of business is located.

## FACTUAL BACKGROUND

**I.      The Viva Glam Enterprise and Its Members and Co-Conspirators**

48.     Upon information and belief, Van Derham established and leads the Viva Glam Enterprise, an association in fact that targets high-net-worth men around the world by offering them the companionship of, and sex with, its attractive "models," uses these men for the Viva Glam Enterprise's financial gain, and obtains personal and proprietary information from them so that the Viva Glam Enterprise and its members may extort additional funds once these men no longer provide funds voluntarily.

49.     Mitchell, Brady, and Curiel are members of the Viva Glam Enterprise.

50.     The Viva Glam Enterprise has numerous other members, including "models" who serve as escorts.

51.     Tablack, Brady's boyfriend, has conspired with the Viva Glam Enterprise when doing so has furthered his own purposes.

**A.      The Roles of Van Derham and *Viva Glam* in the Viva Glam Enterprise**

52.     Van Derham was born and raised in Slovakia and moved to the United States at age 22.

53.     Van Derham is the founder, Chief Executive Officer, and Editor-in-Chief of *Viva Glam*.

54.     *Viva Glam* purports to be a "classic, glamour lifestyle magazine" established in 2012.

55.     However, the true purpose of *Viva Glam* is anything but glamourous. Upon information and belief, *Viva Glam* is a front for the Viva Glam Enterprise to engage in criminal activities, including prostitution.

56.     Upon information and belief, *Viva Glam* recruits attractive women as "models," introduces them to wealthy men, and often arranges for them to serve as escorts for these wealthy men. Upon information and belief, Van Derham functions as the madam.

57.     Upon information and belief, the Viva Glam Enterprise keeps comprehensive data on its potential targets, including the target's net worth, his industry, and his marital status.

58.     The present lawsuit is not the first time *Viva Glam* has been identified as a front for prostitution.  The recently filed complaint by model/actress Greice Santo's husband alleged "on information and belief that Viva Glam is a front for [Daryl] Katz to procure beautiful women for his own personal pleasure."  It was later reported in an April 11, 2017 *Daily Mail* article that plaintiff's wife texted Van Derham "of her concerns" that Katz propositioned her for sex, to which Van Derham allegedly replied:  "It's no big deal, he's like that, he told me he was going to have sex with you no matter what."

59.     Van Derham is no stranger to litigation involving sexually charged activities. She is a co-plaintiff in thirteen lawsuits filed between December 2015 and October 2017 alleging, *inter alia*, various strip clubs published her images without permission to promote their business. In one lawsuit, defendants filed a motion to dismiss the complaint and argued plaintiffs' libel claim was not defamatory *per se*.[2] According to the motion, the plaintiffs failed to adequately allege the images "falsely portray[] each of the Plaintiffs as a stripper, [imputing] unchastity to her" because the images were sexually suggestive in and of themselves, and plaintiffs admittedly had some of the same photographs published in many well-circulated sexually charged and provocative magazines such as *Playboy*, *Maxim*, *Stuff*, and *FHM*.

60.     Van Derham and *Viva Glam* also were named in an October 17, 2017 *BuzzFeed* article for being involved in a sophisticated digital marketing fraud scheme and publishing plagiarized content on their eight websites, including VivaGlamMagazine.com. Although Van Derham defended her websites,

---

[2] *Edmondson, et al v. RCI Hospitality Holdings, Inc., et al.,* 1:16-cv-02242-VEC, filed on March 26, 2016 in the Southern District of New York.

she admitted working with 301network, the advertising platform that was a common thread in the schemes. Mike Zaneis, CEO of Trustworthy Accountability Group, stated: "These websites which you've identified, that's the piggybank, that's the criminal's ATM machine, that's how they take money out of the supply chain. But in order to get there, there's this whole chain of criminal activity, and it starts with the ad-supported piracy."

### B.   The Role of Mitchell in the Viva Glam Enterprise

61.     Mitchell is a fraudster and con artist with a reputation for seducing wealthy men so they will pay for her lavish lifestyle, including abundant plastic surgery.

62.     Prior to moving to Los Angeles in 2015, Mitchell worked as a stripper in Miami, Florida, and she maintains friendships with prostitutes and adult-film actresses.

63.     Shortly after moving to Los Angeles in 2015, Mitchell met Van Derham and associated with the Viva Glam Enterprise.  By affiliating with the Viva Glam Enterprise, Mitchell was able to meet wealthy men more easily.

64.     Upon information and belief, through the Viva Glam Enterprise, Mitchell served as an escort for many of the men she met, and she received compensation for her company and for sex in the form of cash and gifts, including diamonds.

65.     During her deposition, Mitchell testified that on one occasion, she traveled to Dubai for only three days.  Upon information and belief, in exchange for her sexual services, Mitchell acted as a courier for Viva Glam Enterprise to bring back hundreds of thousands of dollars in diamonds.

66.     Mitchell also testified that she accompanied a married wealthy hedge-fund manager from Connecticut on several trips, including two trips to Las Vegas.  Mitchell testified that in Las Vegas, he gave her casino chips so they could gamble together.  When asked specific questions about what they did together during those trips, including whether she went to his hotel room, Mitchell refused to answer.

67.     One of Mitchell's former boyfriends, Daniel Rosenberg, has stated that when he first met Mitchell she was a "beautiful and sweet girl," however, she "started modeling *then became an escort* and her life went downhill."

68.     Between September 2015 and May 2017, the Viva Glam Enterprise, through Mitchell acting as Fowler's girlfriend, engaged in a scheme to defraud Fowler by inducing him to wire more than $100,000 to Mitchell under the false pretense that she needed his money to pay her rent and other expenses. Upon information and belief, Mitchell and her co-defendants were funneling Fowler's money into the Viva Glam Enterprise.

69.     The Viva Glam Enterprise, through Mitchell, also targeted Fowler to gain access to his personal, privileged, and proprietary information, including his algorithm and other trade secrets. Through Mitchell, the Viva Glam Enterprise successfully accessed Fowler's cell phone and copied his personal, privileged, and proprietary information with the intent to extort him and/or sell the information to third parties, including Fowler's business competitors.

70.     During her two-year relationship with Fowler, Mitchell continuously lied to Fowler, including by maintaining the charade that she was employed as a "model." Upon information and belief, Mitchell was, in fact, working as an escort for the Viva Glam Enterprise.

71.     Upon information and belief, Mitchell coordinated her illicit activities through Van Derham and *Viva Glam*. They assisted her "modeling" façade and named her "One of Viva Glam's first ever Supermodels" on *Viva Glam*'s website.[3]

72.     Upon information and belief, Mitchell concealed her criminal activities by, among other things, making false statements on her tax returns and failing to report significant taxable gifts.

73.     Mitchell also testified she is friends with Alexander Podgurski ("Podgurski") and Savannah Farmer ("Farmer"), a couple recently arrested on suspicion of identity theft, conspiracy to commit money laundering, conspiracy to advertise falsely, and conspiracy to access computers without authorization. Upon information and belief, Podgurski and Farmer shared their criminal know-how with Mitchell, who then used that information in furtherance of her and the Viva Glam Enterprise's plan to extort Fowler.

### C.     The Roles of Brady and Tablack in the Viva Glam Enterprise

74.     Brady is from Novosibirsk, Russia.

---

[3] http://vivaglammagazine.com/viva-glam-sexiest-top-20-alanna-kolette/.

75.   Brady and Mitchell, who are best friends, moved from Florida to Los Angeles around the same time. Brady and Mitchell lived in the same building in Los Angeles, and they both associated with the Viva Glam Enterprise shortly after their arrival in Los Angeles.

76.   It is no wonder Brady has described Mitchell as her "soul sister," because Brady, like Mitchell, has lived off her "boyfriends'" money for years, and she will do anything to maintain her lavish lifestyle, including extortion.  Upon information and belief, Brady stole financial documents from a former "boyfriend" and threatened to disclose his failure to pay taxes unless he continued to support her financially.

77.   Upon information and belief, Brady knew that her soul sister needed to find a patron to further the Viva Glam Enterprise, so she introduced Mitchell to Fowler and earned a "commission" through the Viva Glam Enterprise for doing so.

78.   Brady started dating Tablack in 2015.

79.   According to the United States Attorney's Office for the District of New Jersey, Tablack was arrested in December 2017 for arranging the distribution of at least 500,000 cyclopropyl fentanyl pills through the "Dark Web" – an encrypted part of the Internet that is not indexed by search engines and is only accessible with special software – throughout the United States.[4]

80.   Tablack allegedly accepted payment for drugs on the Dark Web with Bitcoin, a cryptocurrency that is common in the narcotics trade due to its relative anonymity.

81.   Upon information and belief, Brady and Mitchell joined Tablack's illegal narcotics operation, and together, they began collecting information on wealthy individuals they could target as financial vehicles to fund their criminal enterprise. Upon information and belief, Brady's involvement in Tablack's drug trafficking was known to federal authorities because her accounts were frozen after Tablack's arrest.

82.   Shortly after Tablack's arrest, Brady and Mitchell visited a storage unit in Los Angeles and transported several pieces of carry-on luggage from the storage unit to Mitchell's BMW.  Upon information and belief, these bags contained money, narcotics, and/or evidence related to the drug

---

[4] https://www.justice.gov/usao-nj/pr/two-california-men-charged-large-scale-opioid-distribution-ring.

trafficking operation. During her deposition, Mitchell refused to answer any questions about the storage unit.

83.     Upon information and belief, Tablack encouraged Brady and Mitchell to continue working with the Viva Glam Enterprise so that he would have access to the wealthy men the Viva Glam Enterprise targeted, including Fowler.

84.     Upon information and belief, Tablack was particularly interested in Fowler because Mitchell and Brady told Tablack that Fowler operated a hedge fund and that he knew about cryptocurrency.

85.     Upon information and belief, Tablack asked Mitchell and Brady to arrange an introduction to Fowler, which they did immediately.

86.     Brady also asked Fowler about Bitcoin, the same cryptocurrency used by Tablack in his illegal drug operation.  Tablack also asked whether Fowler would take his investments, which Fowler understood to mean that Tablack wanted Fowler to launder drug money for him. Fowler refused.

### D.     The Role of Angelica Curiel in the Viva Glam Enterprise

87.     Curiel is a hairstylist and a contributor to *Viva Glam*'s website.[5]

88.     During her deposition, Mitchell testified that Curiel is her "long-time friend" and that Curiel introduced her to Van Derham.  All three traveled together to Hawaii for the same *Viva Glam* photo shoot where model/actress Greice Santo was propositioned for sex by Daryl Katz.

89.     Mitchell also testified that Curiel was shopping with her when Mitchell "lost" her cell phone – which she admitted she uses as her computer – and all of the data on it, shortly after document discovery began and mere weeks before her deposition in this matter.  Upon information and belief, the Viva Glam Enterprise and Curiel conspired with Mitchell to destroy this evidence, which included data about potential targets and linked Mitchell to the Viva Glam Enterprise.

### II.     Mitchell Induces Fowler to Wire Her Money Under False Pretenses

90.     At the beginning of their relationship, Mitchell, with Brady's help, immediately began to take advantage of Fowler's generosity and to exploit his wealth, letting Fowler take them both on an all-

---

[5]  http://vivaglammagazine.com/author/angelica/

expenses-paid vacation to Europe and roping Fowler into wiring Mitchell approximately $100,000 to alleviate Mitchell's "stress" of having bills to pay – stress she claimed otherwise would prevent her from taking the European vacation with Fowler and Brady.

91.   Mitchell induced Fowler to lend her significant amounts of money under the false pretense that she needed his money for rent and other expenses.

92.   Prior to the trip to Europe, Fowler agreed to loan Mitchell $48,000 for one year's rent because she told him she was having trouble affording a place of her own.  The parties specifically agreed this was a loan that Mitchell would have to repay and the purpose was to pay her rent only. Fowler wired Mitchell the $48,000 into her bank account.

93.   Despite the parties' agreement the money was to be used for rent only, Mitchell testified this money was "for rent and expenses, any - any and all expenses. That's what impression Michael Fowler gave me.  Whatever – it wasn't specifically – his specifics were 'Here is $48,000 I will send to you to help you with your expenses, your bills, whatever you need so that you can come with your girlfriend Julia Brady to her birthday trip, London and Paris.'"

94.   Mitchell immediately doubled down and asked Fowler to loan her more money, which she represented she would use for rent, and only rent.  Fowler reluctantly agreed, and on September 14, 2015, Fowler wired $52,000 to Mitchell, explicitly for rent. Eventually, Fowler discovered Mitchell's rent for one year was approximately $36,000, and Mitchell improperly retained the surplus amount.

95.   Unaware of Mitchell's true intentions, Fowler continued to invest in the relationship financially and emotionally.

96.   Two months later, Mitchell convinced Fowler to set up a joint bank account with Mitchell in November 2015, in which Fowler deposited at least $60,000 over the course of a few months. Mitchell testified, "the purpose [of the account] was any and all expenses, needs, living, hair, nails, clothing, cell phone bill.  Whatever I needed, that was just an account he put money.  Gifts, if I needed to buy anything, that account – there was no restrictions onto what I could do with my account."

97.     Contrary to Mitchell's testimony, Fowler did restrict how Mitchell could use the money in the joint account. Fowler and Mitchell specifically agreed that the money in the Account was for "expenses," but did **not** include rent.

98.     During the first phase of their relationship – between April 2015, when they began dating, and March 2016, when they broke up – Mitchell fraudulently induced Fowler to wire her more than $160,000 In addition, Fowler spent considerable sums of money on Mitchell from his personal accounts and credit cards, including $28,000 for jewelry, among other things, and additional money for several rent payments.

99.     Mitchell represented to Fowler verbally and by text message from September 2015 through March 2016 that she was using the money for rent and other expenses.

100.    On or about March 11, 2016, Fowler confronted Mitchell about how she was spending his money. Mitchell broke down and admitted she had misappropriated the money, but she would not tell Fowler what she did with it.

101.    Fowler told Mitchell this was a big problem and a violation of trust. Fowler was concerned that Mitchell might be involved in illicit activities, so he immediately closed the joint bank account.

102.    Upon information and belief, and unbeknownst to Fowler at the time, Mitchell was funneling a portion of the money to the Viva Glam Enterprise to further their criminal activities.

103.    In mid-March 2016, Fowler attempted to have another conversation with Mitchell about the loans for rent, and Mitchell became belligerent. She physically assaulted him.[6] She then took his two phones and threw them in the ocean.

104.    Fowler told Mitchell she needed to leave immediately. Mitchell did so, but first booked a hotel in Puerto Rico using Fowler's credit card without his permission. Fowler immediately reported this activity as fraudulent to his credit card company.

---

[6] This was not the first time Mitchell physically assaulted Plaintiff. On December 27, 2015, Mitchell erroneously assumed Plaintiff was cheating on her, and she punched Plaintiff in the chest and face and ripped his shirt. She threw his phone and other items at him with the intent to injure and scare him. She also locked him out of the balcony of his hotel room. Plaintiff called the police but did not press charges. Mitchell's sister texted Plaintiff to not leave Mitchell and that Mitchell's behavior was excusable.

105.     Fowler did not have any further contact with Mitchell until March 28, 2016, when he asked Mitchell to repay $63,000 for the misappropriated funds and to reimburse him for the plane tickets Mitchell previously agreed she would repay and for the cell phone and glasses she destroyed.

106.     Even though Fowler's request was for far less than Mitchell took from Fowler, Mitchell refused to pay back any of the money or property.

**III.     The Viva Glam Enterprise Conspires to Steal Plaintiff's Personal Information, Including Trade Secrets, and to Induce Him to Continue Wiring Money to Mitchell Under False Pretenses**

107.     On April 27, 2016, Fowler filed a lawsuit against Mitchell, *Fowler v. Mitchell*, Los Angeles Superior Court case #BC618427, for refusing to pay back the money he loaned her and for assault and battery ("Lawsuit 1"). Fowler sought to hold Mitchell accountable for her actions.

108.     Fowler had no idea Mitchell's fraudulent activities were part of a larger RICO enterprise.

109.     While Lawsuit 1 was pending, Mitchell discussed the details of the lawsuit with Van Derham and Brady. Mitchell admitted as much to Fowler. Specifically, in April 2017, when Fowler discovered the lawsuit naming *Viva Glam* as a front for prostitution, Mitchell told Fowler, "I told you about that because Katarina [Van Derham] was really worried when you were suing me before."

110.     Upon information and belief, Van Derham was worried Fowler would find out about the Viva Glam Enterprise's criminal activities, including their prostitution ring, and put an end to the Viva Glam Enterprise. As a result, Van Derham monitored Lawsuit 1 and decided to influence the outcome.

111.     Upon information and belief, Van Derham and Mitchell agreed that Mitchell would convince Fowler to forgive her and settle Lawsuit 1. Upon information and belief, they further agreed that Mitchell would rekindle her romantic relationship with Fowler and, when she got close to him again, she would steal his personal, privileged, and proprietary information so that the Viva Glam Enterprise could extort him with it and/or sell it to third parties, including Fowler's business competitors, many of whom have relationships with members of the Viva Glam Enterprise.

112.     To accomplish the Viva Glam Enterprise's goals, while Lawsuit 1 was pending, Mitchell met with Fowler and broke down sobbing. She confided in Fowler that she had served as an escort in the

past and had misappropriated his money, and she begged for Fowler's forgiveness. Fowler was not aware this was all an act in furtherance of the Viva Glam Enterprise's scheme.

113.    Mitchell's theatrics worked, and Fowler agreed to enter into a settlement agreement on September 13, 2016, whereby Fowler agreed to release Mitchell from her $63,000 debt (the "Settlement Agreement").

114.    After the parties executed the Settlement Agreement, and Mitchell successfully convinced Fowler to release her from her debt, Mitchell and Fowler began spending a significant amount of time together again and rekindled their relationship.

115.    Between September 2016 and May 2017, Mitchell's financial demands from and expectations of Fowler only increased. Eventually, she arranged to live with Fowler in Puerto Rico, where he paid for all of her living expenses, and, in addition, she extracted a sizeable allowance that he wired to her every month, as well as numerous luxury gifts that she moved across state lines.

116.    During her deposition, Mitchell admitted Fowler gave her more than $100,000 in gifts and cash, including art, a tennis bracelet, earrings, clothes, watch, an Amazon Kindle, and a bicycle.  Fowler also paid her rent every month for her apartment in  Los Angeles.

117.    In reality, Fowler gave Mitchell approximately $850,000 in cash, gifts, and other luxury items during their two-year relationship.

**IV.    Brady and Tablack Attempt to Compromise Fowler on Their Own Behalf and on Behalf of the Viva Glam Enterprise**

118.    At the same time, Brady tried to involve Fowler in illegal activities to accomplish the twin goals of helping Tablack's drug operations and of compromising Fowler so that the Viva Glam Enterprise could control his behavior should he be inclined to report or otherwise threaten the continued viability of the Viva Glam Enterprise.

119.    In October 2016, Brady asked Fowler for "his thoughts" about Bitcoin, the same cryptocurrency Tablack was using for his illegal narcotics operation on the Dark Web.

120.    Fowler replied that Bitcoin has no real value other than the fact that it is anonymous, so the value is for someone who is probably doing "shady stuff."

121.    Brady responded: "Interesting."

122. Fowler inquired: "Are you laundering money or something?"

123. Brady responded: "Me? I wish hahaha. Jk no I just read about those things."

124. The next month, Brady texted Fowler to solicit his advice on investments: "I need to invest some money somewhere."

125. Upon information and belief, Brady was looking for a way to launder Tablack's drug money.

### V. Mitchell Steals Fowler's Personal Information

126. At the same time Brady was trying to compromise Fowler by involving him in her boyfriend's illegal drug ring, Mitchell was trying to steal information from Fowler that she could use later to extort him.

127. Mitchell knew Fowler conducted business on his cell phone and personal laptop ("Devices"). Fowler's Devices contained personal information, privileged information, including communications with his attorney, and confidential information, including Fowler's algorithm and trade secrets, pertaining to his multi-family office hedge-fund activities and the personal software he employs to engage in those activities.

128. Fowler's personal, privileged, and proprietary information (the "Protected Information") includes, but is not limited to:

- Communications between Fowler and members of management for companies in which Fowler is a private investor;

- Financial records for companies in which Fowler is a private investor;

- Communications with and by board members of companies for which Fowler serves on the Board of Directors or equivalent;

- Communications with individuals and entities with which Fowler has signed non-disclosure agreements;

- Communications discussing financial transfers with and among Fowler's business partners in their multi-family office;

- Communications discussing financial account balances and account numbers with and among Fowler's business partners in their multi-family office;

- Communications discussing portfolio positioning and strategy with and among Fowler's business partners in their multi-family office;

- Communications discussing specific mathematical algorithms with and among Fowler's business partners in their multi-family office;

- Fowler's communications with his private medical physician and other licensed medical providers;

- Fowler's communications with his tax advisors and counsel;

- Fowler's notes on his multi-family office's trade secrets; and

- Fowler's communications with his family and friends relating to details about his personal life and relationships.

129.    The Devices were continuously on the Internet.

130.    The Devices were password protected.

131.    Fowler never gave Mitchell authority to access the Devices. At no time did Fowler give Mitchell authority to access, view, copy, and/or disseminate the Protected Information. In fact, on numerous occasions, Fowler specifically told Mitchell that she was prohibited from accessing his Devices and his Protected Information.

132.    Mitchell nevertheless accessed, viewed, copied, and/or disseminated the Protected Information on the Devices.

133.    Indeed, Fowler has video footage of Mitchell engaging in these activities.

134.    The video footage was taken by a surveillance camera inside Fowler's Puerto Rico home on March 20, 2017. In the video, Mitchell is sitting on Fowler's couch while Fowler is sleeping on the adjacent couch. Mitchell reaches for Fowler's cell phone on the table. The video shows Mitchell viewing Fowler's phone, without Fowler's knowledge and authorization, and using her own phone to take dozens of photos of the contents of Fowler's phone.

135.   Although Fowler only has video of one isolated instance, it is evident Mitchell was comfortable and used to engaging in this type of wrongful conduct.

136.   Between March and April of 2017, Mitchell threatened Fowler that she would use his information to "destroy him."

**VI.   The Viva Glam Enterprise Exerts Its Influence in This Litigation**

137.   Prior to commencing this action, Fowler's counsel sent two letters to Mitchell:  a Demand for Inspection of her Electronic Devices and a Preservation of Evidence Letter.

138.   Mitchell testified during her deposition that she received both letters and gave them to her attorney.

139.   Because Van Derham was worried that Fowler could expose the Viva Glam Enterprise, she required Mitchell to keep her informed about her relationship with Fowler and whether Fowler threatened the Viva Glam Enterprise.

140.   Upon information and belief, the Viva Glam Enterprise, through Van Derham, encouraged Mitchell to destroy evidence relevant to Fowler's claims against Mitchell because the evidence would have implicated the Viva Glam Enterprise in criminal and racketeering activities.

141.   Upon information and belief, Mitchell took Van Derham's encouragement.

142.   When asked to produce documents in this litigation, Mitchell claimed that all of her documents relating to *Viva Glam* were "lost or inadvertently destroyed." She also claimed that she only received "a t-shirt" when asked to specify any money or item of value she received from *Viva Glam*.

143.   In addition, shortly after document discovery began and mere weeks before her deposition in this matter, Mitchell "lost" her cell phone – which she admitted she uses as her computer – and all of the data on it while in the company of Curiel, another member of the Viva Glam Enterprise.

## FIRST CAUSE OF ACTION

**Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)**
**(Against Defendants Van Derham, *Viva Glam*, Mitchell, Brady, and Curiel)**

144.   Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

145. Defendants Van Derham, *Viva Glam*, Mitchell, Brady, and Curiel (collectively, the "Count 1 Defendants") agreed to and did conduct and participate in the conduct of the Viva Glam Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of luring wealthy men to pay the Viva Glam Enterprise for the company of, and sexual relations with, its "models" and to avoid exposure of their relations with these women.

146. Pursuant to and in furtherance of their fraudulent scheme, the Count 1 Defendants committed multiple related acts of wire fraud, extortion, economic espionage, theft of trade secrets, and violations of the National Stolen Property Act, including the following:

- Using the interstate wires to obtain Plaintiff's money by false pretenses and misrepresentations, specifically, at least 18 wire communications between September 2015 through May 2017 to make payments to Mitchell, which she falsely stated were used to pay her rent and other expenses;

- Stealing and otherwise accessing, copying, downloading, uploading, and replicating, without authorization, Plaintiff's personal, privileged, and proprietary information, including Plaintiff's algorithm and other trade secrets;

- Making verbal threats to Plaintiff that Mitchell would use his information to "destroy him"; and

- Transporting proceeds of unlawful prostitution activities coordinated through defendant *Viva Glam*, including diamonds, other expensive jewelry, and money from locations outside of the United States, including Dubai, into the United States and across state lines.

147. The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

148. The Count 1 Defendants have directly and indirectly conducted and participated in the conduct of the Viva Glam Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

149. As a direct and proximate result of the Count 1 Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business and property in that: he was

defrauded out of substantial sums of money; he was defrauded into purchasing luxury gifts for Mitchell; and his personal, privileged, and proprietary information was stolen.

150.    As a result of the violations of 18 U.S.C. § 1962(c), Plaintiff has suffered substantial damages in an amount to be proven at trial. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble his general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of the Count 1 Defendants' violations of 18 U.S.C. § 1962(c), and accordingly, is further entitled to judgment against the Count 1 Defendants.

**<u>SECOND CAUSE OF ACTION</u>**

**Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d)**

**(Against All Defendants)**

151.    Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

152.    This count is against all of the defendants (the "Count 2 Defendants").

153.    As set forth above, the Count 2 Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, the Count 2 Defendants conspired to conduct and participate in the conduct of the affairs of the Viva Glam Enterprise through a pattern of racketeering activity.

154.    The Count 2 Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the Viva Glam Enterprise through a pattern of racketeering activity. The Count 2 Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

155.    As a direct and proximate result of the Count 2 Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in his business and property in that:  he was defrauded out of substantial sums of money; he was defrauded into purchasing luxury gifts for Mitchell; and his personal, privileged, and proprietary information was stolen.

156.    As a result of the conspiracy by and among the Count 2 Defendants to violate 18 U.S.C. § 1962(c), Plaintiff has suffered substantial damages in an amount to be proven at trial. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of the Count 2 Defendants' violations of 18 U.S.C. 1962(c), and accordingly, is further entitled to judgment against the Count 2 Defendants.

### THIRD CAUSE OF ACTION

### Civil Conspiracy to Commit Violations of RICO and Other Torts

### (Against All Defendants)

157.    Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

158.    Upon information and belief, all of the Defendants formed and operated a conspiracy to commit the wrongful acts alleged herein, including multiple related acts of wire fraud, extortion, economic espionage, theft of trade secrets, and violations of the National Stolen Property Act, including the following:

- Using the interstate wires to obtain Plaintiff's money by false pretenses and misrepresentations, specifically, at least 18 wire communications between September 2015 through May 2017 to make payments to Mitchell, which she falsely stated were used to pay her rent and other expenses;

- Stealing and otherwise accessing, copying, downloading, uploading, and replicating, without authorization, Plaintiff's personal, privileged, and proprietary information, including Plaintiff's algorithm and other trade secrets;

- Making verbal threats to Plaintiff that Mitchell would use his information to "destroy him"; and

- Transporting proceeds of unlawful prostitution activities coordinated through defendant *Viva Glam*, including diamonds, other expensive jewelry, and money, from locations outside of the United States, including Dubai, into the United States and across state lines.

159.    The foregoing wrongful acts constitute underlying torts giving rise to the causes of action alleged herein.

160.    Defendants committed the wrongful acts alleged herein in furtherance of the conspiracy.

161.    Plaintiff has suffered damages as a result of Defendants' wrongful and conspiratorial conduct.  Defendants' conspiratorial conduct, as alleged herein, was outrageous, willful, and wanton, and perpetrated with an evil motive and a reckless indifference to Plaintiff's rights.

162.    By reason of the foregoing, Plaintiff is entitled to a judgment against Defendants, jointly and severally, for compensatory and punitive damages in an amount which has not yet been ascertained and which will be proven at trial.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment
### (Against All Defendants)

163.    Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

164.    Defendants were unjustly enriched as a result of their wrongful acts, including accessing, copying, selling, and/or distributing Plaintiff's personal, privileged, and proprietary information without Plaintiff's authorization.

165.    Defendants received benefits from Plaintiff's personal, privileged, and proprietary information in that the information can be sold and/or distributed to third parties, including Plaintiff's business competitors, for their own financial gain.

166.    Defendants received benefits from Plaintiff's personal, privileged, and proprietary information in that the information also can be used to extort Plaintiff.

167.    Defendants unjustly retained such benefits at the expense of Plaintiff.

**FIFTH CAUSE OF ACTION**

**Conversion**

**(Against All Defendants)**

168.    Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

169.    Plaintiff had ownership and/or rights to possession of his personal, privileged, and proprietary information.

170.    Defendants converted the Protected Information by wrongful acts, including accessing, copying, selling, and/or distributing the information without Plaintiff's authorization.

171.    As a result of Defendant's actions, Plaintiff has suffered damages in an amount which has not yet been ascertained and which will be proven at trial.

**SIXTH CAUSE OF ACTION**

**Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.***

**(Against All Defendants)**

172.    Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

173.    The Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*. ("CFAA"), prohibits unauthorized access of "protected computer[s]" under certain circumstances.  The term "protected computer" includes a computer "which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." 18 U.S.C. § 1030(e)(2)(B). A protected computer includes any website that is accessible on the Internet.

174.    The Devices were protected computers under 18 U.S.C. § 1030(e)(2)(B).

175.    Mitchell and her co-conspirators gained unauthorized access to the Devices. Mitchell and her co-conspirators did so to obtain and use valuable information from the Devices, including the Protected Information.

176.    Mitchell and her co-conspirators accessed, viewed and made copies of the Protected Information.

177.    On information and belief, Mitchell and her co-conspirators distributed, disseminated, and/or sold the Protected Information to third parties.

178.    Mitchell and her co-conspirators knowingly, willfully, and with an intent to defraud Plaintiff accessed the Devices without authorization or in excess of authorization and obtained valuable information from the Devices that on information and belief, Mitchell and her co-conspirators used to obtain something of value.

179.    Plaintiff has been damaged in excess of $5,000.

180.    Plaintiff has been damaged by Mitchell and her co-conspirators' actions, including being forced to expend resources to investigate the unauthorized access and abuse of his computer network. Plaintiff seeks compensatory and other equitable relief under 18 U.S.C. § 1030(g) in an amount to be proven at trial.

181.    Plaintiff has suffered irreparable and incalculable harm and injuries resulting from Mitchell and her co-conspirators' conduct, which harm will continue unless Mitchell and her co-conspirators are enjoined from further unauthorized use of the Devices and the Protected Information. Plaintiff has no adequate remedy at law.

## SEVENTH CAUSE OF ACTION

### Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511 *et seq.*

### (Against All Defendants)

182.    Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

183.    The Electronic Communications Privacy Act, 18 U.S.C. § 2511 *et seq.* ("ECPA"), prohibits unauthorized access to electronic communications intended as confidential. The stored communication provisions of the ECPA specifically prohibit unauthorized access to, or use of, stored electronic communications.

184.    Mitchell and her co-conspirators violated 18 U.S.C. § 2511(1)(a) by intentionally collecting, gathering, intercepting, endeavoring to intercept, transmitting, storing, and/or procuring any other person to intercept or endeavor to intercept Plaintiff's electronic communications.

185.    Mitchell and her co-conspirators violated 18 U.S.C. § 2511(1)(c) by intentionally collecting, transmitting, storing, and disclosing, or endeavoring to disclose, to any other person, the contents of Plaintiff's electronic communications, knowing or having reason to know that the information was obtained through the interception of Plaintiff's electronic communications.

186.    Mitchell and her co-conspirators violated 18 U.S.C. § 2511(1)(d) by intentionally using or endeavoring to use, the contents of Plaintiff's electronic communications, knowing or having reason to know that the information was obtained through the interception of private electronic communications.

187.    Plaintiff did not authorize or consent to Mitchell and her co-conspirators' interception of electronic communications.

188.    Section 2520 of the ECPA provides for a private cause of action and allows for declaratory and equitable relief as appropriate and statutory damages of the greater of $10,000 or $100 a day for each day of violation, actual and punitive damages, and reasonable attorneys' fees and costs.

**EIGHTH CAUSE OF ACTION**

**The Stored Communications Act, 18 U.S.C. § 2701, *et seq*.**

**(Against All Defendants)**

189.    Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

190.    The Stored Communications Act, 18 U.S.C. § 2701 *et seq*. ("SCA"), is violated when a person "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility, and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system . . . ." 18 U.S.C. § 2701(a).

191.    Mitchell and her co-conspirators violated 18 U.S.C. § 2701(a)(1) by intentionally accessing without authorization Plaintiff's protected Devices and obtaining and copying the contents of his private electronic communications.

192.    Mitchell and her co-conspirators further violated 18 U.S.C. § 2701(a)(2) by intentionally accessing without authorization Plaintiff's protected Devices and deleting electronic communications intended for Plaintiff.

193.    Plaintiff did not authorize or consent to Mitchell and her co-conspirators' access of his private electronic communications.

194.    The SCA provides a right of action for persons "aggrieved by any violation of this chapter in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind." 18 U.S.C. § 2707(a).

195.    The SCA allows for declaratory and equitable relief as appropriate and statutory damages as the sum of the actual damages suffered by Plaintiff and any profits made by Mitchell and her co-conspirators as a result of the violation, but in no case less than the sum of $1,000, plus punitive damages and reasonable attorneys' fees. 18 U.S.C. § 2707(b)-(c).

## **NINTH CAUSE OF ACTION**

### **Breach of Contract**

### **(Against Defendant Mitchell)**

196.    Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

197.    The parties entered into a written Settlement Agreement on September 13, 2016 to settle Lawsuit 1, *Fowler v. Mitchell*, Case No. BC618427, filed on April 27, 2016 in the Los Angeles Superior Court.

198.    Plaintiff performed his obligations under the Settlement Agreement.

199.    Mitchell breached the Settlement Agreement, specifically paragraph 10 regarding the Covenant-Not-To-Sue and paragraph 13 regarding Confidentiality.

200.    Paragraph 10 of the Settlement Agreement states: "Covenant not to Sue: The Parties, and

each of them, covenant and agree that neither they nor their agents, employees, or assigns will hereafter commence, maintain, or prosecute any action at law or otherwise, or assert any claim or charge against each other, its agents, employees, and attorneys, relating to the Action."

201.    The Settlement Agreement defines "Action" as "the Parties' claims and disputes, if any, relating in any way to, or arising out of, the facts and transactions referenced in the pleadings filed in an action, including any claims asserted therein, pending in the Superior Court of the State of California for the County of Los Angeles, entitled *Fowler v. Mitchell*, bearing Case No. BC618427."

202.    In the present litigation, Mitchell alleges in her Cross-Complaint in paragraph 3: "On information and belief, Fowler filed Lawsuit #1 as a ploy to get back together with Mitchell."

203.    By making this allegation, Mitchell breached paragraph 10 of the Settlement Agreement because her allegation is a "claim" and "charge" against Plaintiff relating to Lawsuit 1.  This allegation puts Lawsuit 1 at issue in the present litigation.

204.    Paragraph 13 of the Settlement Agreement states: "Confidentiality: Each Party agrees that at all times hereafter they shall maintain in strict confidence and not disclose to any other person, except that Parties' immediate family, attorneys, accountants and tax advisors as necessary (and only after advising them of their obligation to maintain confidentiality): (i) the fact or terms of this Agreement; or (ii) any information regarding the claims released herein, including but not limited to the specific allegations of wrongful conduct."

205.    Mitchell breached Paragraph 13 by disclosing the facts and terms of the Settlement Agreement to third parties including Van Derham, Brady, and Curiel.

206.    As a direct and proximate result of Mitchell's multiple breaches of the Settlement Agreement, Plaintiff has suffered damages in an amount which has not yet been ascertained and which will be proven at trial.

207.    Plaintiff also is entitled to receive his attorneys' fees, costs, and necessary disbursements to enforce the terms of the Settlement Agreement, in accordance with paragraph 23 of the Settlement Agreement, which states: "Attorneys' Fees: If any action at law or in equity is necessary to enforce or

interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs, and necessary disbursements in addition to such other relief to which he may be entitled."

## TENTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

### (Against Defendant Mitchell)

208.    Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

209.    As a party to the Settlement Agreement, Mitchell owed Plaintiff the duty to deal honestly, fairly, and in good faith.

210.    Mitchell breached her duty of good faith and fair dealing because she entered into the Settlement Agreement with the malicious intent to rekindle a romantic relationship with Plaintiff in furtherance of the conspiracy to commit the wrongful acts alleged herein, including multiple related acts of wire fraud, extortion, economic espionage, theft of trade secrets, and violations of the National Stolen Property Act.

211.    As a direct and proximate result of Mitchell's multiple breaches of the Settlement Agreement, Plaintiff has been deprived the benefit of the contract and has suffered damages in an amount which has not yet been ascertained and which will be proven at trial.

## PRAYER

As a result of the above, Plaintiff prays that the Court award the following relief:

    a.    Economic damages including actual damages and restitution;

    b.    Treble damages;

    c.    Exemplary damages and interest;

    d.    Attorneys' fees and costs;

    e.    Injunctive relief preventing Mitchell and her co-conspirators from further distributing the Protected Information; and

    f.    Any other relief to which Plaintiff is entitled.

Dated: May 11, 2018

BOVINO & ASSOCIATES LLC

_David A. Bovino_

David A. Bovino
Attorney for Plaintiff Michael J. Fowler

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 11, 2018

BOVINO & ASSOCIATES LLC

_David A. Bovino_

David A. Bovino
Attorney for Plaintiff Michael J. Fowler

**PROOF OF SERVICE**

I certify that I am a resident of the United States, I am over the age of eighteen (18), and not a party to or interested in the within entitled cause. I am an employee of Bovino & Associates, LLC and my business address is Bovino & Associates, 600 East Hopkins, Suite 300, Aspen, Colorado 81616. On May 11, 2018, I caused to be served the following document on the parties in this action:

**PLAINTIFF MICHAEL J. FOWLER'S FIRST AMENDED COMPLAINT FOR VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c); VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d); CIVIL CONSPIRACY; CONVERSION; UNJUST ENRICHMENT; VIOLATION OF COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030, *ET SEQ.;* VIOLATION OF ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2511, *ET SEQ.;* VIOLATION OF STORED COMMUNICATIONS ACT, 18 U.S.C. § 2701, *ET SEQ.;* BREACH OF CONTRACT; AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

 X   BY E-MAIL: Based on an agreement of the parties to accept electronic service, I caused the foregoing document to be transmitted via email to the electronic service address below.

Attorneys for Defendant:
RAFII & NAZARIAN, LLP
Joseph Nazarian
9100 Wilshire Boulevard, Suite 465E
Beverly Hills, California 90212
PH: 310-777-7877
FX: 310-777-7855
E-mail: Joe@rafiilaw.com

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on May 11, 2018, in Atlanta, Georgia.

_____
Katie Gorman

FIRST AMENDED COMPLAINT

**Exhibit "3"**



1    David A. Bovino (SBN 257462)
     David@BovinoLaw.com
2    Maria Gorecki (*Pro Hac Vice*)
     Maria@BovinoLaw.com
3    BOVINO & ASSOCIATES LLC
     600 East Hopkins Avenue, Suite 301
4    Aspen, Colorado 81611
5    PH: (970)925-4445
     FX: (970)925-5333
6
7    Attorney for Plaintiff
     Michael J. Fowler
8

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAY 2 2 2018

Sherri R. Carter, Executive Officer/Clerk
By Anthony He, Deputy

RECEIVED
DEPT. 48

MAY 2 1 2018

9              **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                          **COUNTY OF LOS ANGELES**

11

12   MICHAEL J. FOWLER, an Individual,          Case No. BC670883

13          Plaintiff,                          **ORDER GRANTING PLAINTIFF MICHAEL**
                                                **J. FOWLER'S MOTION FOR LEAVE TO**
14          v.                                  **FILE FIRST AMENDED COMPLAINT TO**
                                                **CONFORM TO EVIDENCE**
15   ALANNA MITCHELL aka ALLANNA
     KOLETTE, an Individual, and DOES 1 through 15,
16   inclusive,
                                                Date:    May 11, 2018
17          Defendant.                          Time:    8:30 a.m.
                                                Dept.:   48
18   ALANNA MITCHELL aka ALLANNA
     KOLETTE,                                   CRS Reservation: 180304294766
19
                                                Assigned for All Purposes to
20          Cross-Complainant,                  Hon. Elizabeth A. White
21          v.
                                                Action Filed: August 1, 2017
22   MICHAEL J. FOWLER, and ROES 1 through 15,  Trial Date: Not Set
     inclusive,
23
24          Cross-Defendant(s).
25
26   //
27   //
28   //



                                          1
     ORDER GRANTING PLAINTIFF MICHAEL J. FOWLER'S MOTION FOR LEAVE TO FILE FIRST AMENDED
                         COMPLAINT TO CONFORM TO EVIDENCE

1      The Motion for Leave to File a First Amended Complaint to Conform to Evidence ("Motion")

2    filed by Plaintiff/Cross-Defendant, Michael J. Fowler ("Plaintiff/Cross-Defendant"), came on regularly

3    for noticed hearing on May 11, 2018 at 8:30 a.m. in Department 48 of the Los Angeles Superior Court

4    located at 111 North Hill Street, Los Angeles, California 90012 in the above-captioned case, with David

5    A. Bovino, Esq., and Maria Gorecki, Esq., appearing on behalf of Plaintiff/Cross-Defendant, and Joseph

6    Nazarian, Esq., appearing via CourtCall on behalf of Defendant/Cross-Complainant Alanna Mitchell

7    a/k/a Allanna Kolette.

8      After full consideration of the moving and opposing papers, the arguments of counsel, and the

9    papers on file with the Court concerning this action, and good cause appearing therefore,

10    **IT IS HEREBY ORDERED:**

11    1.    Plaintiff/Cross-Defendant's Motion is granted.

12    2.    Plaintiff/Cross-Defendant's First Amended Complaint is to be filed today and deemed

13    served as of the date of this order upon Defendant/Cross-Complainant Alanna Mitchell a/k/a Allanna

14    Kolette, who has thirty days to respond.

15    3.    Plaintiff/Cross-Defendant is to serve the First Amended Complaint upon the newly-added

16    defendants within 60 days and file proofs of service reflecting such service.

17

18    Date: May 11, 2018                   Elizabeth Allen **White**

19                                      The Honorable Elizabeth A. White

20                                      Judge of the Superior Court

21

22

23

24

25

26

27

28

ORDER GRANTING PLAINTIFF MICHAEL J. FOWLER'S MOTION FOR LEAVE TO FILE FIRST AMENDED
COMPLAINT TO CONFORM TO EVIDENCE